GARFIELD HEIGHTS CITY SCHOOL DISTRICT, Appellant,

v.

STATE BOARD OF EDUCATION, Appellee.

[Cite as *Garfield Hts. City School Dist. v. State Bd. of Edn.* (1990), 62 Ohio App.3d 308.]

Court of Appeals of Ohio,
Franklin County.

No. 89AP–713.

Decided Dec. 20, 1990.

310

*Arter & Hadden, Tom McDonald, M. Neal Rains, Z. Sonali Bustamante* and *David C. Patterson,* for appellant.

*Anthony J. Celebrezze, Jr.,* Attorney General, and *Christopher M. Culley,* for appellee.

STRAUSBAUGH, Judge.

Appellant appeals the judgment of the Franklin County Court of Common Pleas affirming appellee's decision approving the transfer of territory from the Cleveland City School District to that of appellant. The subject area is located in the northeast corner of the city of Garfield Heights ("Garfield Heights") bordering the southeast section of the city of Cleveland ("Cleveland"). The proposed transfer area contains Precincts A, C, E, and F of Ward 1 of Garfield Heights. Transfer proceedings were initiated when electors residing in those precincts and Precinct F of Ward 2 of Garfield Heights filed petitions pursuant to R.C. 3311.24 requesting the transfer of those areas from

Cleveland to Garfield Heights. While Precinct F of Ward 2 was included in the legal description in the petitions, it was not shown on the map contained in the petitions and therefore subsequently excluded from the proposed transfer area. On March 24, 1988, Cleveland filed the petitions with appellee, the State Board of Education ("board").

On June 13, 1988, the board adopted a resolution declaring its intent to consider the proposed transfer. On July 8, 1988, appellant, Garfield Heights City School District, submitted its request for a hearing regarding the proposed transfer. On February 8, 1989, the referee assigned by the board to hear the transfer matter issued his report and recommended that the board approve the request for the proposed transfer of territory. Appellant then filed its objections to the report, and on April 10, 1989 the board held a public meeting to which interested parties were invited to give brief testimony. During the public meeting, appellant filed a motion for a continuance with the board requesting that it take no final action on the proposed transfer of territory until the vacancy left on the board by the resignation of Ronald M. Popek was filled. Popek was the board member from the Twentieth Congressional District which includes Garfield Heights. The board denied appellant's motion and passed a resolution adopting in full the referee's report and approved the transfer of territory.

Appellant then appealed the board's decision and filed a motion to stay execution of the decision pending appeal. Appellant's motion was granted and implementation of the board's decision was stayed until May 26, 1989, the date that the trial court scheduled the matter for hearing. On June 7, 1989, the trial court held that the board had jurisdiction to conduct proceedings and render a decision on the transfer matter despite the inconsistency between the map and legal description contained in the transfer petitions. The trial court also held that a "work session," which appellant argued unfairly prejudiced the results of the board's decision, was properly noticed and did not violate appellant's due process rights. The trial court thereafter affirmed the board's decision transferring the subject area from Cleveland to Garfield Heights and held that the board's decision was based upon reliable, probative, and substantial evidence.

On June 8, 1989, the city of Cleveland passed a resolution transferring the territory in accordance with the board's decision. On June 13, 1989, appellant appealed the trial court's judgment to this court. Appellant also filed a motion with the trial court requesting a stay of its judgment pending appeal which the trial court denied. Appellant then filed a motion for stay with this court and that motion was granted on July 14, 1989, with the trial court's judgment being stayed during the pendency of this appeal.

On appeal, appellant sets forth the following five assignments of error for this court's review:

"1.   The trial court erred in ruling that the transfer petitions were valid.

"2.   The trial court erred in holding that *ex parte* communications between the State Board and the Petitioners' representatives did not violate Garfield's due process rights.

"3.   The trial court erred in holding that the State Board's failure to postpone its transfer decision pending replacement of the Board member from the 20th Congressional District did not constitute prejudicial error.

"4.   The trial court abused its discretion in holding that the State Board's transfer decision was supported by reliable, probative and substantial evidence.

"5.   The trial court erred in affirming the State Board's Order because the transfer will not result in coterminous municipal and school boundaries."

At the outset, it is necessary for this court to delineate the appropriate standard for review of the trial court's decision in this matter. Recently, in *Rossford Exempted Village School Dist. v. State Bd. of Edn.* (1989), 45 Ohio St.3d 356, 544 N.E.2d 651, the Supreme Court of Ohio affirmed this court's decision and held in the syllabus:

"An appeal may be taken to the court of common pleas pursuant to R.C. 119.12 from an order of the State Board of Education resulting from a hearing or adjudication pursuant to a request for transfer of territory pursuant to R.C. 3311.24."

R.C. 119.12 codified the standard under which an administrative appeal is to be decided by the trial court. R.C. 119.12 provides, in pertinent part:

"The court may affirm the order of the agency complained of in the appeal if it finds, upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law. In the absence of such a finding, it may reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law.   * * * "

Thus, the trial court is to affirm the order of the agency from which an appeal has been taken pursuant to R.C. 119.12 where the order is supported by reliable, probative, and substantial evidence and is in accordance with law. *In re Wellesley Corp.* (1985), 18 Ohio St.3d 176, 18 OBR 229, 480 N.E.2d 461; *Univ. of Cincinnati v. Conrad* (1980), 63 Ohio St.2d 108, 17 O.O.3d 65, 407 N.E.2d 1265; *Andrews v. Bd. of Liquor Control* (1955), 164 Ohio St. 275, 58 O.O. 51, 131 N.E.2d 390. However, upon appeal to an appellate court, the

standard of review is even more limited. In *Lorain City Bd. of Edn. v. State Emp. Relations Bd.* (1988), 40 Ohio St.3d 257, 533 N.E.2d 264, the Supreme Court of Ohio set forth the standard by which an appellate court is to review an order of an administrative agency:

"In reviewing an order of an administrative agency, an appellate court's role is more limited than that of a trial court reviewing the same order. It is incumbent on the trial court to examine the evidence. Such is not the charge of the appellate court. The appellate court is to determine only if the trial court has abused its discretion. An abuse of discretion ' " * * * implies not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency." ' * * * Absent an abuse of discretion on the part of the trial court, a court of appeals must affirm the trial court's judgment. * * *

"The fact that the court of appeals, or this court, might have arrived at a different conclusion than did the administrative agency is immaterial. Appellate courts must not substitute their judgment for those of an administrative agency or a trial court absent the approved criteria for doing so." *Id.* at 260–261, 533 N.E.2d at 267.

Accordingly, it is within this limited standard of review that we address appellant's assignments of error.

■ In its first assignment of error, appellant argues that the trial court's decision should be reversed since the petitions which initiated the transfer contained an inconsistency between the map and legal description of the transfer area. Appellant argues that since the petitions were defective, the board was without jurisdiction to decide the transfer issue. Appellant insists that as there exists substantial discrepancy between the map and the legal description of the transfer area on the face of the petition, reversal is warranted since such error would tend to mislead qualified electors as to the actual area proposed for transfer.

R.C. 3311.24, as in effect at the time of the trial court's decision, provided, in pertinent part:

"If the board of education of a city school district or of an exempted village school district deems it advisable to transfer territory from such district to an adjoining city or exempted village school district or to a county school district, or if a petition, signed by seventy-five per cent of the qualified electors residing within that portion of a city or exempted village school district proposed to be transferred voting at the last general election, requests such a transfer, the board of education of the district in which such proposal originates shall file such proposal, together with a map showing the bound-

aries of the territory proposed to be transferred, with the state board of education prior to the first day of April in any even-numbered year. * * * " [1]

In the present case, the petitions which were circulated regarding the proposed transfer included a map, a legal description, and an included summary.

While the map on the petitions accurately reflected the proposed transfer area, the legal description erroneously included a list of lot numbers which were not part of the map or summary description. Upon review of the statute, we agree with the trial court that R.C. 3311.24 requires that a map be submitted to the state board in support of the territory which is proposed to be transferred only if the requisites of the petition are fulfilled. Nevertheless, this court must determine whether the additional erroneous information included with the petitions precludes the proposed transfer.

Appellant has directed this court's attention to its previous decision in *Olen Corp. v. Franklin Cty. Bd. of Elections* (1988), 43 Ohio App.3d 189, 541 N.E.2d 80, which involved a deviation between the wording in a rezoning proposal as adopted by the county commissioners and the description of the area to be rezoned contained in the referendum petition. The trial court in that case found that the inaccuracy was not misleading or confusing apparently based upon the absence of testimony that anyone was actually misled. In reversing the trial court's decision, this court stated:

" * * * [T]he test to be applied is an objective test, not a subjective test. The determination of whether the statute has been complied with is to be made from the petition itself, coupled with evidence of the actual existing circumstances, rather than by the testimony of witnesses as to their personal beliefs about the petition or its effect, either as to themselves or their acquaintances. * * * The issue, however, is not whether someone was in fact misled, but rather whether the language itself coupled with the actual existing circumstances is misleading to the average voter utilizing an objective standard." *Id.* at 193, 541 N.E.2d at 84.

Appellant also directs this court's attention to *State, ex rel. Schultz, v. Bd. of Elections* (1976), 50 Ohio App.2d 1, 4 O.O.3d 1, 361 N.E. 477, affirmed, 48 Ohio St.2d 173, 2 O.O.3d 372, 357 N.E.2d 1079, in which the court stated:

" * * * If the petition contains any additional information it must be of such a character as to promote the attempt to fairly and accurately present the question or issue and must not in any way detract from a free, intelligent and informed choice by the average citizen who has requested to make a decision

---

1. This statute was subsequently amended effective October 2, 1989 in which the cited portion of the statute now appears in R.C. 3311.24(A).

as to whether he should or should not sign such a petition." *Id.* at 11–12, 4 O.O.3d at 7, 361 N.E.2d at 484–485.

Following a review of the petitions which were circulated, we do not find that the errors contained in the petitions which were circulated are misleading to the average voter when we apply an objective standard. Rather, it is more likely that the average voter relied upon the map instead of the legal description which contained a list of lot numbers, some of which were not included in the proposed area to be transferred. It appears that the petitions submitted to the board accurately reflected the proposed transfer territory and that the requisite number of signatures were supplied so as to meet the requirements of R.C. 3311.24. Accordingly, appellant's first assignment of error is not well taken and is overruled.

■ Appellant next contends in its second assignment of error that a "work session" held on April 9, 1989 involved ex parte communications between the board and representatives of petitioners and thereby violated appellant's due process rights. While the board contends that the session was open to the public and notice was submitted to the news media announcing the "work session," appellant insists that representatives of the petitioners were personally invited to the board's "work session" and actually engaged in conversation with board members regarding the transfer. Since the board was functioning in an adjudicatory capacity, appellant insists that the board was required to give appellant an equal opportunity to attend the April 9 "work session" and to present testimony or other evidence relevant to the issues presented during the meeting. Appellant argues that the issue as to whether the "work session" was properly noticed is irrelevant to the issue as to whether the "work session" constitutes ex parte communications since appellant should have been personally notified of the meeting and permitted to participate in it.

In response to this argument, the board argues that as a political subdivision of the state, appellant does not have any constitutional rights to due process. However, this argument ignores Ohio Adm.Code 3301–89–01(D) which provides:

" * * * In those situations where agreement does not exist, the state board of education will thoroughly examine the stated reasons for and against the requested transfer and provide due process to all parties involved as set forth in paragraph (E) of rule 3301–89–02 of the Administrative Code."

We note that Ohio Adm.Code 3301–89–02(E) provides:

"Upon receipt of the data from the department of education, the state board of education may declare its intention to consider the request for transfer of

certain territories from one school district to another by passing a resolution of intention to consider the matter and providing the parties an opportunity for a hearing."

While the board may have personally contacted the petitioner advising it of the "work session," it did more than was required, but this in no way impinged the rights of appellant. Moreover, upon review of the record, we agree with the trial court that the "work session" was properly noticed pursuant to R.C. 121.22(A). Nevertheless, we do not agree with appellant's position that the "work session" constitutes an adjudication, but rather we conclude that the discussion which occurred is more properly characterized as legislative in nature and, therefore, appellant has no more "right" to participate than the general public. Even if appellant were entitled to personal notice of this "work session," we find no deprivation of any alleged due process rights since due process does not mandate that appellant be able to attend and participate at every stage of the proceedings, but rather that appellant had a meaningful opportunity to be heard and present evidence in its favor. See *Union Title Co. v. State Bd. of Edn.* (1990), 51 Ohio St.3d 189, 555 N.E.2d 931. In the present case, appellant did in fact have repeated opportunities to present evidence as to all the determinative issues regarding the proposed transfer. Accordingly, we find appellant's second assignment of error to be without merit and it is therefore overruled.

In its third assignment of error, appellant contends that the board's decision to forgo postponing its vote pending replacement of the representative from the Twentieth Congressional District was prejudicial to appellant since the board member represented much of the affected Garfield Heights area. Pursuant to R.C. 3301.011, the board is comprised of one member from each congressional district as is created under R.C. 3521.01. R.C. 3301.05, then in effect, stated that fifteen members of the board constituted a quorum for the transaction of business.[2] There exists no requirement that a member of any specific district be present when a decision is to be made by the board. We find no merit in appellant's arguments that the absence of a board member from a particular congressional district prejudiced it from being fairly represented. Accordingly, as the requisites of R.C. 3301.05 were met, we conclude that appellant's third assignment of error is not well taken and is overruled.

In its fourth assignment of error, appellant argues that the trial court erroneously concluded that the board's order was supported by reliable,

---

2. R.C. 3301.05 has been amended effective October 2, 1989 so that only fourteen members of the board are required to constitute a forum.

probative, and substantial evidence. Initially, appellant insists that the referee assigned to hear the case by the board improperly relied upon his past experiences as well as his own personal opinions. While the trial court concluded that the referee may have been influenced by such factors, it nevertheless found that on the basis of the most important factor to be given consideration, that being the good of the students, the board's decision transferring the affected area was supported by reliable, probative, and substantial evidence. We find no abuse of discretion by the trial court in reaching this conclusion.

Appellant also contends that the trial court erred in finding that the best interests of the transferred students were a primary or main factor for consideration since the Ohio Administrative Code requires that the transfer request be considered in light of several factors which include not only the welfare of the transferred students but also what is in the best interests of the students of the area which is to absorb the transferred students. Appellant insists that those factors dealing with finances, physical accommodations, supplies, equipment, and teachers demonstrate its inability to accommodate the proposed transfer.

The Ohio Administrative Code sets forth those factors which are to be considered by the board in ruling on a transfer request pursuant to R.C. 3311.24. See Ohio Adm.Code 3301–89–01(F), 3301–89–02(B), and 3301–89–03(B). Ohio Adm.Code 3301–89–02(B) requires that upon receipt of a request for transfer of territory, the department of education is to send to each of the school districts involved in the proposed transfer a request for information which includes seventeen questions, the answers to which are to be considered in hearing a request for a transfer of territory. Specifically, Ohio Adm.Code 3301–89–02(B) provides:

"Upon receipt of the initial request for a transfer of territory under section 3311.06 or 3311.24 of the Revised Code, the department of education shall send to each of the school districts involved in the proposed land transfer a request for information. This request includes seventeen questions. The answers to these questions, along with other considerations, will be considered. The seventeen questions are:

"(1) Why is the request being made?

"(2) Are there racial isolation implications?

"(a) What is the percentage of minority students in the relinquishing district?

"(b) What is the percentage of minority students in the acquiring district?

"(c) If approved, would the transfer result in an increase in the percentage of minority pupils in the relinquishing district?

"(3) What long-range educational planning for the students in the districts affected has taken place?

"(4) Will the acquiring district have the fiscal and human resources to efficiently operate an expanded educational program?

"(5) Will the acquiring district have adequate facilities to accommodate the additional enrollment?

"(6) Will both of the districts involved have pupil population and property valuation sufficient to maintain high school centers?

"(7) Will the proposed transfer of territory contribute to good district organization for the acquiring district?

"(8) Does the acquiring district have the capacity to assume any financial obligation that might accompany the relinquished territory?

"(9) Will the loss of either pupils or valuation be detrimental to the fiscal or educational operation of the relinquishing school district?

"(10) Have previous transfers caused substantive harm to the relinquishing district?

"(11) Is the property wealth in the affected area such that the motivation for the request could be considered a tax grab?

"(12) Are there any school buildings in the area proposed for transfer?

"(13) What are the distances between the school buildings in:

"(a) The present area?

"(b) The proposed area?

"(14) If approved, will the requested transfer create a school district with noncontiguous territory?

"(15) Is the area being requested an isolated segment of the district of which it is a part?

"(16) Will the municipal and school district boundary lines become coterminous?

"(17) For both of the districts:

"(a) What is the inside millage?

"(b) What is the outside operating millage?

"(c) What is the bonded indebtedness millage?"

Ohio Adm.Code 3301–89–03(B) sets forth nine additional factors, which are not intended to be exhaustive, that are also to be considered by the referee

who has been appointed to hear the transfer request. Ohio Adm.Code 3301–89–03(B) provides:

"Other factors that a referee shall consider in hearing any request for a transfer of territory for school purposes include, but are not necessarily limited to:

"(1) Documented agreements made by public agencies involved in municipal annexation proceedings should be honored;

"(2) A previous agreement entered into by the school districts concerned should be honored unless all concerned districts agree to amend it;

"(3) There should not be undue delay in requesting a transfer for school purposes after a territory has been annexed for municipal purposes;

"(4) The transfer shall not cause, preserve, or increase racial isolation;

"(5) All school district territories should be contiguous unless otherwise authorized by law;

"(6) School district boundary lines that have existed for a long period of time should not be changed if substantial upheaval results because of long-held loyalties by the parties involved;

"(7) The pupil loss of the relinquishing district should not be such that the educational program of that district is severely impaired;

"(8) The fiscal resources acquired should be commensurate with the educational responsibilities assumed; and

"(9) The educational facilities of districts should be effectively utilized."

In addition to the foregoing requirements, Ohio Adm.Code 3301–89–01(F) requires that when a request for transfer of territory is made, it is to be "considered upon its merit with primary consideration given to the present and ultimate good of the pupils concerned." Thus, the several factors for consideration set forth in Ohio Adm.Code 3301–89–02(B) and 3301–89–03(B) are intended to be an integral part of the board's transfer decision with primary consideration given to the present and ultimate good of all the students who are affected by the proposed transfer.

While appellant argues that the trial court's decision should be reversed because there exists no reliable, probative, and substantial evidence to support the referee's findings and conclusions, we again note that the standard of review before this court is whether the trial court abused its discretion in affirming the board's decision. In order for there to exist an abuse of discretion, the trial court's decision must constitute more than an error of judgment but must be unreasonable, arbitrary, or unconscionable.

Specifically, we note the standard announced by the Supreme Court in *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 19 OBR 123, 482 N.E.2d 1248:

" ' "[A]n abuse of discretion involves far more than a difference in * * * opinion * * *. The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an 'abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias. * * * " ' *State v. Jenkins* (1984), 15 Ohio St.3d 164, 222 [15 OBR 311, 360, 473 N.E.2d 264, 313]." *Id.* at 87, 19 OBR at 126–127, 482 N.E.2d at 1252.

It appears that the thrust of appellant's argument is that the primary consideration as set forth in Ohio Adm.Code 3301–89–01(F) is controlled by the financial impact such a transfer will have on the accepting district. Appellant argues that the referee's decision was not in accordance with law because he did not consider those criteria which related to the fiscal implications of the transfer and also cites as error his failure to make specific findings as to the financial implications of the proposed transfer. Appellant insists that the racial issue of the proposed transfer was considered to the exclusion of the finances involved in the transfer.

Following a discussion of each of the parties' positions relative to the proposed transfer, the referee specifically stated that he had considered all nine factors enumerated in Ohio Adm.Code 3301–89–03(B) as well as the participant's answers to the seventeen questions asked pursuant to Ohio Adm.Code 3301–89–02(B). Furthermore, the referee concluded that the proposed transfer would be "for the good of all pupils involved." While the financial impact of a proposed transfer will necessarily affect the academic integrity of the school district acquiring the transferred district, as well as the transferred territory itself, the "present and ultimate good of the pupils concerned" is to be viewed in context of all the factors set forth in Ohio Adm.Code 3301–89–02 and 3301–89–03 as well as all other relevant factors which will have an impact on the proposed transfer. At the time of the proposed transfer before the referee, five hundred forty-two students would enter appellant's district, consisting of twenty-eight kindergarten students, three hundred nine first through eighth grade students, and two hundred five ninth through twelfth grade students. The assessed valuation of the area proposed to be transferred was $12,180,770 or $22,473.745 per student, amounting to a total revenue of $780.85 per student. It appears that the then current per student expenditure in appellant's district was approximately $3,624.

In response to the difference between the revenue per student of the proposed transferred district and the current expenditure in appellant's district, the referee noted that the transfer would produce an additional $342,482 in state support and $422,111 in real and personal property taxes, for a total of $764,593 annually. In an effort to ease the financial strain which may potentially impact upon appellant, the referee suggested that appellant could cut its cost in transportation and still meet state minimum standards. The referee also pointed to R.C. 3311.24, which provides that when a transfer of territory is made, there must be a distribution of funds and indebtedness between the districts involved in the transfer. Furthermore, this statute mandates that the legal title of the school property of the proposed transferred territory will be vested in the board of education of the acquiring school district.[3] The referee noted that this would perhaps mean that books, desks, equipment, and buses, or their equivalent value, might be provided in a transfer.

The referee also suggested that other sources of revenue for transportation would include state reimbursement for one half the cost of additional passenger buses, one hundred percent of the cost of any special education buses, and additional state funds might be available to bus students for racial balance. The referee suggested that appellant could explore the cost-saving alternatives of leasing buses or buying used buses. The referee also discussed the costs of teachers and staff, as well as supplies and equipment. The referee concluded that the salary schedules of teaching staff did not present a significant financial bar to the proposed transfer.

Appellant insists that it was incumbent upon the referee to make more specific findings regarding the financial impact that the transfer would have upon appellant. Specifically, appellant directs this court's attention to the following portions of the referee's report at 27–29:

" * * * The evidence presented by the parties fell far short of proving the actual financial impact which this transfer would have upon the Garfield Heights District. The testimony presented by Garfield Heights seemed to be designed to show the 'financial disaster' which this transfer would have rather than to make a realistic assessment of what might occur. On the other hand, even though Cleveland's testimony effectively showed the flaws in the analysis presented by Garfield Heights, it did little to establish an accurate forecast of what might be if the transfer were approved.

---

**3.** Although R.C. 3311.24 has been amended effective October 2, 1989, the language to which the referee referred remains, in essence, unchanged in the amended version of the statute.

"In short, based upon the evidence presented, the Referee can neither find that a financial disaster will occur, nor can he rule it out. Much depends upon the attitude of the Garfield Heights board and its administration. As was stated by Superintendent Beshara, '[M]y responsibility is to provide the best educational program possible with the financial resources which have been made available.' * * *

"Additionally, testimony indicated that Garfield Heights soon would be seeking an additional local tax measure to meet projected shortfalls in revenue regardless of the outcome of this matter. Possibly, the goal for this tax measure would need to be raised to deal with some of the issues raised by Garfield Heights herein. However, in view of the apparent strong support for this petition within the Cranwood area, similar support might be expected within that area for a tax levy.

"Finally, experience shows that school finance in Ohio is, at best, unpredictable in view of the frequent changes in support from the state level. The reason for Garfield Heights' excursion into the loan fund in the early 1980's apparently was its overestimation of foundation funds which it would receive. * * *

"In summary, in view of the overall unpredictability of school finance, and the failure of the evidence to establish any credible prediction of the actual economic impact which this transfer would have on the Garfield Heights district, the financial impact is not a determinative factor in this decision."

In his conclusions, the referee also stated, at 37:

"The Referee can make no precise calculation as to the financial impact of this transfer because school funding projections are imprecise. The Referee does conclude that Garfield Heights, with careful planning and the proper, positive motivation, can produce the money necessary to absorb the transfer students."

■ However, the referee then proceeded to suggest possible means in which appellant could acquire additional funds, such as passing a tax levy. While such revenue may be somewhat speculative, a possible tax levy is a *relevant* factor to be considered in the case of a proposed transfer. The referee also noted that a newly constructed power plant was also anticipated to provide $165,000 in taxes to the school system beginning in the 1989 calendar year; however, at the time of the referee's report, this additional income had not been realized. Again, while appellant stresses the speculative nature of such income, these factors cannot be considered irrelevant.

The referee recognized that the board has broad discretion to consider *all* relevant factors in reaching its decision in making a determination with

"primary consideration given to the present and ultimate good of the pupils concerned." See R.C. 3311.24 and Ohio Adm.Code Chapter 3301–89. The referee found that the issue of race was an important factor to be considered in the proposed transfer. The referee concluded that the proposed transfer would reduce the racial isolation of the district proposed to be transferred and would ultimately benefit both those students of the district to be transferred as well as the students in appellant's district by enriching the racial composition and promoting a sense of unity between the communities. The referee stated that approval of the transfer would also assist in eliminating the appearance of a dual school system separated solely by race.

An examination of the record in the present case reveals that a change in school district boundaries would benefit the students in the proposed transferred district by reducing travel time, thereby reducing the risk of accident. There also existed evidence that by allowing students to stay nearer their homes it would assist in promoting a sense of community among those students and would foster improved interaction between all students. We believe that it is appropriate for the board to consider both the social and educational needs of all affected students, as well as the potential financial implications of a transfer. When a transfer of school districts is proposed, a balancing must take place between many competing factors in order to achieve the desired result of achieving what is in the best interests of the students concerned.

We are inclined to agree with the trial court in that the referee hearing a proposed transfer of a school territory is not required to set forth the manner in which each of the problems which necessarily accompany a transfer is to be remedied. Rather, we agree that such solutions are more appropriately left to the board of education of the acquiring school district, as well as the individuals in the communities involved in the transfer. The referee in such a case is merely to decide whether, based upon all relevant factors, the proposed transfer would adversely affect the best interest of *all* students involved, and whether it would indeed be in their best interest. We find no abuse of discretion by the trial court in concluding that the board's decision was supported by reliable, probative, and substantial evidence and was in accordance with the law. While the finances involved in a proposed transfer may perhaps be more accurately and clearly set forth by both the parties and the referee, the social factors which the referee addressed are also important and cannot be ignored. We believe that the trial court cannot be said to have abused its discretion in concluding that the referee complied with Ohio Adm.Code 3301–89–01(F) and considered the proposed transfer upon its merit, with reference to relevant factors, and concluded that a transfer would

be in the present and ultimate good of the students concerned. As we find no abuse of discretion by the trial court in affirming the board's decision, we find appellant's fourth assignment of error to be not well taken and it is therefore overruled.

■ Finally, appellant argues in its fifth assignment of error that the trial court's decision should be reversed since the transfer would not result in coterminous boundaries. Appellant insists that if the transfers were implemented, municipal and school district boundary lines would not be coterminous and thereby contrary to law. We note that appellee has failed to respond to appellant's argument.

R.C. 3311.06 provides, in pertinent part:

"(B) The territory included within the boundaries of a city, local, exempted village, or joint vocational school district shall be contiguous except where a natural island forms an integral part of the district, where the state board of education authorizes a noncontiguous school district, as provided in division (E)(1) of this section, or where a local school district is created pursuant to section 3311.26 of the Revised Code from one or more local school districts, one of which has entered into an agreement under section 3313.42 of the Revised Code."

Ohio Adm.Code 3301–89–02 also requires that the referee consider as a relevant factor whether the municipal and school district boundaries would be contiguous.

The term "contiguous" is defined in Webster's as "being in actual contact: touching along a boundary or at a point * * *." The idea of adjoining boundaries is consistent with the idea expressed by 1 McQuillin, The Law of Municipal Corporations (2 Ed., Smith Rev. 1940), Section 294, at 812, in which it is stated:

"Laws usually require in express terms, that, to authorize annexation the territory must be contiguous or adjacent to the municipal corporation that desires to include it. Contiguous lands are such as are not separated from the corporation by outside land; such as are so situated with reference to the corporation that it may reasonably be expected that after annexation they will unite with the corporation in making a homogeneous city, which will afford to its several parts the ordinary benefits of local government. But however near they are to the petitioning corporation, if the circumstances are such that it could not reasonably be expected that the parts would amalgamate and form a municipal unit which would afford to each the ordinary benefits of local government it would not be proper to annex them. 'When actual unity is impracticable, legal unity should not be attempted.' Several tracts may be

annexed as being contiguous if one tract is contiguous to the municipality and the other tracts are contiguous to each other. Tracts of land are not contiguous where the only place they join each other is at a point at the corner of the two." (Footnotes omitted.)

At the outset, we note the limited case law in this area. In *Bd. of Edn. of Warren Township Rural School Dist. v. Bd. of Edn. of Warren City School Dist.* (1929), 121 Ohio St. 213, 167 N.E. 872, the Supreme Court considered the legality of a transfer of territory made by the county board of education which transferred territory from a township district to a city district pursuant to statute which required that the boundaries be contiguous. The county board had made the transfer so as to leave in the township district an area of approximately eighty-one acres upon which valuable industrial properties were located and which was argued to be contiguous with the rest of the rural district by a two-foot, three-mile-long strip of contiguous nonresidential property. The court held:

" * * * Section 4685, General Code, provides: 'The territory included within the boundaries of a city, village or rural school district shall be contiguous except where an island or islands form an integral part of the district.'

"The county board of education in 1916 clearly violated that section in making changes in the boundaries of the districts, which left an 81–acre tract of land segregated from the township district and only connected therewith by a two-foot strip of ground nearly three miles in length. The county board of education had no more right to leave that tract of land segregated from the main body of the township district than it would have had to take it away from the city district by direct and affirmative action. * * * " *Id.* at 217, 167 N.E. at 873.

Thus, the court concluded that where one area was connected to another by a strip two feet long and three miles wide, there existed no territories which were not contiguous within the meaning of the statute. But, see, *Blanchard v. Bissell* (1860), 11 Ohio St. 96 (in which it was held that a boundary was contiguous even though it was separated by stretches of deep and navigable waters).

In *Watson v. Doolittle* (1967), 10 Ohio App.2d 143, 39 O.O.2d 267, 226 N.E.2d 771, the court addressed a similar situation, in which it was argued that the territory to be annexed was contiguous on the basis of a small connecting strip. The court quoted the following from 19 Ruling Case Law 734:

" '40. Requirement of Contiguity.—The legislature, unless restrained by the constitution, may provide for the consolidation of cities without regard to the distance between them, absorbing in their consolidation all the intervening

space, whether occupied by boroughs or townships. But such legislation is not conceivable, for the common sense of the people would not tolerate it. Even less desirable is the annexation of land to a municipality which is not contiguous thereto, but is separated by land constituting some other territorial unit. The legal as well as the popular idea of a town or city in this country, both by name and use, is that of oneness, community, locality, vicinity; a collective body, not several bodies; a collective body of inhabitants—that is, a body of people collected or gathered together in one mass, not separated into distinct masses, and having a community of interest because residents of the same place, not different places. So, as to territorial extent, the idea of a city is one of unity, not of plurality; of compactness or contiguity, not separat[ion] or segregation. The statutes which permit municipal corporations to annex territory without special legislative authority in each case always require that the territory so annexed be contiguous; and when the annexation is left in the discretion of a judicial tribunal contiguity will be required as a matter of law.' " *Id.* at 149–150, 39 O.O.2d at 271, 226 N.E.2d at 775.

The court also quoted the following passage from 37 American Jurisprudence (1941) 644, Section 27:

" 'The legal as well as the popular idea of a municipal corporation in this country, both by name and use, is that of oneness, community, locality, vicinity; a collective body, not several bodies; a collective body of inhabitants—that is, a body of people collected or gathered together in one mass, not separated into distinct masses, and having a community of interest because residents of the same place, not different places. So, as to territorial extent, the idea of a city is one of unity, not of plurality; of compactness or contiguity, not separation or segregation.' " *Id.* at 150, 39 O.O.2d at 271, 226 N.E.2d at 775–776.

This case does not present the factual situation wherein the district to be acquired is attached only by a small strip of land. Rather, appellant only insists that municipal and school district boundary lines will not be coterminous if the proposed transfer is implemented. Clearly, the proposed transfer will indeed promote a sense of unity between these communities which is a major purpose behind such statutes. Upon review of the record before us, it appears that the area will in fact be contiguous provided that the Cranwood area is part of the transferred district. As we conclude that the proposed transfer will result in the boundary lines being contiguous, and in compliance with the applicable statutes, appellant's fifth assignment of error is not well taken and is overruled.

Based on the foregoing, appellant's assignments of error are not well taken and are overruled. The judgment of the trial court is hereby affirmed.

*Judgment affirmed.*

Reilly, P.J., concurs.

Young, J., concurs separately.

Young, Judge, concurring separately.

I concur in the decision reached in this matter for the reason that I do not find an abuse of discretion by the trial court. The trial court examined the factors set forth in Ohio Adm.Code 3301–89–01(F), 3301–89–92(B), 3301–89–03(B) and 3301–89–02(B) which must be considered pursuant to R.C. 3311.24 and found reliable, probative and substantial evidence to support the State Board of Education's decision.

However, I am concerned that the Garfield Heights School District will be unable to fund, not only the students in the present school district, but will be even less capable of educating the students in the proposed Garfield Heights School District.

Assuming Exhibit 11 is accurate and is to be believed, we find the following information: (1) The General Fund per pupil expenditure within the Cleveland School District for 1986–1987 was $4,231; (2) The General Fund per pupil expenditure within Cuyahoga county for 1986–1987 was $4,249; (3) The General Fund per pupil expenditure for the Garfield Heights School District for 1986–1987 was $3,543; and (4) The General Fund expenditure for the newly proposed Garfield Heights School District would have been $3,201.51 for 1986–1987.

Therefore, in the event the funding remains in the same proportion, the newly proposed Garfield Heights School District will have available merely 75.33 percent of the county-wide funding. Because the general fund monies available to Garfield Heights are already far below the county average, a further reduction of $300 per pupil will in all likelihood have a decided effect upon the operation of the Garfield Heights School District. The various authorities who have considered this problem during the proceedings have offered no solution whatsoever on how the general fund monies may be supplemented in an amount which would bring the Garfield Heights School District back to its per pupil expenditure before the proposed annexation. To do so would require an infusion of $1,117,336.