**BARTCHY et al., Appellants,**

v.

**STATE BOARD OF EDUCATION et al., Appellees.**

[Cite as *Bartchy v. State Bd. of Edn.*, 170 Ohio App.3d 349, 2007-Ohio-300.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 06AP–697.

Decided Jan. 25, 2007.

---

350

Manley Burke, Timothy M. Burke, and Emily T. Supinger, for appellants.

Marc Dann, Attorney General, Todd R. Marti, Assistant Attorney General, and Reid T. Caryer, for appellee State Board of Education.

David C. DiMuzio, Inc., and David C. DiMuzio, for appellee Cincinnati City School District.

FRENCH, Judge.

{¶ 1} Appellants, Joann and Richard Bartchy, Donna and Robert Salmon, Marilyn and Bernard Schlake, and Beverly and Wayne Morris, appeal from the judgment of the Franklin County Court of Common Pleas that affirmed the order of the State Board of Education denying appellants' petition to transfer their property from the Cincinnati Public School District ("CPSD") to the Madeira City School District ("MCSD").

{¶ 2} In March 2000, eight residents residing on Windridge Drive in the city of Madeira, Hamilton County, Ohio, submitted to CPSD a petition proposing to transfer their four properties, located in the city of Madeira, from CPSD to MCSD. As required by R.C. 3311.24(A), these eight residents were "equal to or more than the 75% required of the qualified electors residing within the portion of the property proposed to be transferred."

{¶ 3} In August 2000, CPSD submitted the petition to the Ohio Department of Education ("ODE"). In accordance with Ohio Adm.Code 3301–89–02(B) and in response to ODE's request, both CPSD and MCSD submitted answers to 17

questions, as well as other information. On May 13, 2004, the board adopted a resolution declaring its intention to consider the petition.

{¶ 4} A hearing officer held an evidentiary hearing on the matter on March 23, 2005. On April 28, 2005, the hearing officer issued a recommendation that the board deny the transfer. Appellants filed objections, and CPSD responded. On July 15, 2005, the board adopted a resolution adopting the hearing officer's recommendation and denying the transfer.

{¶ 5} On July 27, 2005, appellants appealed the board's decision to the trial court. On June 8, 2006, the court issued a decision affirming the board's denial of the transfer. Appellants filed a timely appeal to this court, and they raise the following assignment of error:

> The trial court erred in finding that the decision of the [board] is supported by reliable, probative, and substantial evidence and is in accordance with law.

{¶ 6} Before reaching the merits of appellants' assignment of error, we first consider CPSD's argument that the board lacked subject-matter jurisdiction to consider the proposed transfer. Here, appellants filed the petition pursuant to R.C. 3311.24, and the board made its decision pursuant to that section. CPSD argues, however, that R.C. 3311.06 is the exclusive provision by which petitioners may seek transfers of property that has been the subject of an annexation proceeding. That section applies here, CPSD argues, because the property subject to the transfer petition was annexed to the city of Madeira in 1996. The board did not take a position on the jurisdictional question.

{¶ 7} We begin with the principle that "[w]here the language of a statute is plain and unambiguous and conveys a clear and definite meaning there is no occasion for resorting to rules of statutory interpretation. An unambiguous statute is to be applied, not interpreted." *Sears v. Weimer* (1944), 143 Ohio St. 312, 28 O.O. 270, 55 N.E.2d 413, paragraph five of the syllabus. Thus, "[i]t is only where the words of a statute are ambiguous or are based upon an uncertain meaning or there is an apparent conflict of some provisions that a court has the right to interpret a statute." *Drake–Lassie v. State Farm Ins. Cos.* (1998), 129 Ohio App.3d 781, 788, 719 N.E.2d 64, citing *Kroff v. Amrhein* (1916), 94 Ohio St. 282, 114 N.E. 267. And "[u]nless words are otherwise defined or a contrary intent is clearly expressed," we must give words contained in a statute "their plain and ordinary meaning." *Cincinnati Metro. Hous. Auth. v. Morgan,* 104 Ohio St.3d 445, 2004-Ohio-6554, 820 N.E.2d 315, at ¶ 6, citing *Coventry Towers, Inc. v. Strongsville* (1985), 18 Ohio St.3d 120, 122, 18 OBR 151, 480 N.E.2d 412, and *Youngstown Club v. Porterfield* (1970), 21 Ohio St.2d 83, 86, 50 O.O.2d 198, 255 N.E.2d 262.

{¶ 8} Here, our analysis concerns two statutory provisions relating to the same subject matter: transfers and/or annexations for school purposes. All statutes that relate to the same general subject matter " 'must be read *in pari materia.* * * * And, in reading such statutes *in pari materia,* and construing them together, this court must give such a reasonable construction as to give the proper force and effect to each and all such statutes.' " *United Tel. Co. of Ohio v. Limbach* (1994), 71 Ohio St.3d 369, 372, 643 N.E.2d 1129, quoting *Johnson's Markets, Inc. v. New Carlisle Dept. of Health* (1991), 58 Ohio St.3d 28, 35, 567 N.E.2d 1018. With these principles in mind, we turn to the statutes at issue.

{¶ 9} R.C. 3311.24(A) provides for the filing of a petition, signed by 75 percent of the qualified electors residing within the portion of a city, exempted village, or local school district proposed to be transferred, requesting a transfer of territory from one district to an adjoining district. Pursuant to this provision, the petition is filed with the board of education of the district in which the proposal originates, and that board must submit the petition to the state board. The state board then sets the matter for hearing, as was done in this case.

{¶ 10} R.C. 3311.06 addresses property that is the subject of an annexation for municipal purposes and prescribes procedures for annexing that property for school purposes. Pursuant to R.C. 3311.06(C)(1), "[w]hen all of the territory of a school district is annexed to a city or village," that territory automatically becomes part of the city or village school district, and "legal title to school property in such territory for school purposes" vests in the board of education of the city or village school district. See, also, *Smith v. Granville Twp. Bd. of Trustees* (1998), 81 Ohio St.3d 608, 616, 693 N.E.2d 219 ("The language of R.C. 3311.06(C)(1) indicates that assimilation of the annexed territory's school district into the acquiring territory is mandatory").

{¶ 11} However, when the annexed territory includes only a part of a school district, R.C. 3311.06(C)(2) provides the following:

When the territory so annexed to a city or village comprises part but not all of the territory of a school district, the said territory becomes part of [the city or village school district] only upon approval by the state board of education, unless the district in which the territory is located is a party to an annexation agreement with the city school district.

Any urban school district that has not entered into an annexation agreement with any other school district whose territory would be affected by any transfer under this division and that desires to negotiate the terms of transfer with any such district shall conduct any negotiations under division (F) of this section as part of entering into an annexation agreement with such a district.

Any school district, except an urban school district, desiring state board approval of a transfer under this division shall make a good faith effort to

negotiate the terms of transfer with any other school district whose territory would be affected by the transfer. Before the state board may approve any transfer of territory to a school district, except an urban school district, under this section, it must receive the following:

(a) A resolution requesting approval of the transfer, passed by at least one of the school districts whose territory would be affected by the transfer;

(b) Evidence determined to be sufficient by the state board to show that good faith negotiations have taken place or that the district requesting the transfer has made a good faith effort to hold such negotiations;

(c) If any negotiations took place, a statement signed by all boards that participated in the negotiations, listing the terms agreed on and the points on which no agreement could be reached.

{¶ 12} R.C. 3311.06(I) also provides the following:

No transfer of school district territory or division of funds and indebtedness incident thereto, pursuant to the annexation of territory to a city or village shall be completed in any other manner than that prescribed by this section regardless of the date of the commencement of such annexation proceedings, and this section applies to all proceedings for such transfers and divisions of funds and indebtedness pending or commenced on or after October 2, 1959.

{¶ 13} CPSD argues that because the property at issue here was annexed to the city of Madeira in 1996 and comprised "part but not all of the territory of a school district," R.C. 3311.06(C)(2) applies to preclude transfer of the property to MCSD for school purposes unless, pursuant to R.C. 3311.06(C)(2)(a), the board receives a resolution requesting approval of the transfer from CPSD or MCSD. Because the board has not received such a resolution from either school district, CPSD concludes, the board did not have jurisdiction to consider appellants' petition.

{¶ 14} Appellants respond, however, that R.C. 3311.06 provides one method, but not the exclusive method, for transferring property that was once annexed. We agree. Nothing in R.C. 3311.06 precludes property owners from petitioning for transfer under R.C. 3311.24. Although R.C. 3311.06(I) states that no transfer "pursuant to the annexation of territory" may occur except through R.C. 3311.06, the petition for transfer at issue here was not made "pursuant to the annexation," but was made independently of it.

{¶ 15} The board's rules also appear to maintain this method for property-owner petitions, independent of the annexation process. Ohio Adm.Code 3301–89–02 sets out the procedures for a request for transfer of territory under R.C. 3311.06 or 3311.24. Ohio Adm.Code 3301–89–02(A) identifies three types of "[i]nitial requests" for property transfers: (1) a school district may request a

transfer under R.C. 3311.06 by sending a letter to the board; (2) a board of education desiring to transfer property under R.C. 3311.24 may request a transfer by filing a request with the board; and (3) persons "interested in requesting a transfer of territory from one school district to another, for school purposes, pursuant to [R.C. 3311.24], may petition to do so through the resident board of education." Ohio Adm.Code 3301–89–02(A)(3). These rules give no indication that an annexation in 1996 would preclude a petition for transfer under R.C. 3311.24 in 2000.

{¶ 16} In R.C. 3311.061, the General Assembly codified the intent behind the 1986 amendments to R.C. 3311.06: "[T]o provide a mechanism whereby urban area school officials and boards of education that are willing to work together to establish cooperative education programs for the benefit of the school children in their districts may, through a process of negotiation and compromise, jointly resolve some of the issues related to the treatment of school territory annexed for municipal purposes." The petition process in R.C. 3311.24, which requires the participation of all affected school districts, does not interfere with this intent.

{¶ 17} Finally, citing *Smith*, 81 Ohio St.3d 608, 693 N.E.2d 219, CPSD asserts that "[t]he Ohio Supreme Court has ruled that *all* school territory transfers in annexed areas must be governed by the R.C. § 3311.06." (Emphasis sic.) We disagree with CPSD's reading of *Smith*.

{¶ 18} In *Smith*, a property owner sought to annex property, for municipal purposes, to the city of Newark; for school purposes, however, the property would remain within the boundaries of the village of Granville schools. The board of county commissioners denied the annexation request, and the common pleas court affirmed. The court of appeals initially found that the commissioners had applied the incorrect test for determining whether to grant the request, but ultimately determined that annexation of the property would cause overcrowding in the Granville schools and, on that basis alone, affirmed the denial.

{¶ 19} On appeal, the Ohio Supreme Court reversed that decision. Although the court concluded that the court of appeals had correctly applied the test for determining whether annexation was appropriate, the court concluded that the court of appeals had erred by considering the issue of overcrowding. The court stated:

> However, consideration and resolution of issues that might require a transfer of school district properties to an adjacent district to balance an inequity that arises due to annexation of property under R.C. 709.02 to 709.34 are reserved solely for the State Board of Education. Under such conditions, R.C. 3311.06

provides a mechanism whereby a school district may petition to transfer territory between districts.

(Footnote omitted.)  *Smith*, 81 Ohio St.3d at 615–616, 693 N.E.2d 219.

{¶ 20} The court did not consider whether R.C. 3311.06 is the exclusive method by which a transfer of previously annexed property may occur and did not hold as much.   Instead, the court concluded that exclusive jurisdiction for considering and resolving issues of property transfers for school purposes lies with the board, not with the county commissioners.   The court also stated that R.C. 3311.06 provides "a mechanism," but never stated that R.C. 3311.06 was "the mechanism" for transferring annexed property.   These conclusions are not inconsistent with the trial court's conclusion that the board had authority to consider the transfer petition under R.C. 3311.24.   Therefore, we reject CPSD's argument that the board lacked jurisdiction, and we turn to the merits of the case.

{¶ 21} In their sole assignment of error, appellants argue that the trial court erred by finding that the board's denial of the transfer is supported by reliable, probative, and substantive evidence and is in accordance with law.   In an administrative appeal, pursuant to R.C. 119.12, the trial court reviews an order to determine whether it is supported by reliable, probative, and substantial evidence and is in accordance with the law.   In applying this standard, the court must "give due deference to the administrative resolution of evidentiary conflicts." *Univ. of Cincinnati v. Conrad* (1980), 63 Ohio St.2d 108, 111, 17 O.O.3d 65, 407 N.E.2d 1265.

{¶ 22} The Ohio Supreme Court has defined "reliable, probative, and substantial evidence" as follows:

(1) "Reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true.   (2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue.   (3) "Substantial" evidence is evidence with some weight; it must have importance and value.

(Footnotes omitted.)  *Our Place, Inc. v. Ohio Liquor Control Comm.* (1992), 63 Ohio St.3d 570, 571, 589 N.E.2d 1303.

{¶ 23} On appeal to this court, the standard of review is more limited. Unlike the court of common pleas, a court of appeals does not determine the weight of the evidence.  *Rossford Exempted Village School Dist. Bd. of Edn. v. State Bd. of Edn.* (1992), 63 Ohio St.3d 705, 707, 590 N.E.2d 1240.   In reviewing the court of common pleas' determination that the board's order was supported by reliable, probative, and substantial evidence, this court's role is limited to determining whether the court of common pleas abused its discretion.  *Roy v.*

*Ohio State Med. Bd.* (1992), 80 Ohio App.3d 675, 680, 610 N.E.2d 562. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. However, on the question of whether the board's order was in accordance with the law, this court's review is plenary. *Univ. Hosp., Univ. of Cincinnati College of Medicine v. State Emp. Relations Bd.* (1992), 63 Ohio St.3d 339, 343, 587 N.E.2d 835.

{¶ 24} As noted, the Ohio Administrative Code prescribes the standards and procedures by which a hearing officer must consider a petition to transfer under R.C. 3311.24. Ohio Adm.Code 3301–89–01(F) provides that "[a] request for transfer of territory will be considered upon its merit with primary consideration given to the present and ultimate good of the pupils concerned." Ohio Adm.Code 3301–89–02(B) provides a list of 17 questions that both school districts must answer to aid in the consideration, and those answers become part of the record. Ohio Adm.Code 3301–89–03 also lists ten additional factors that the hearing officer must consider.

{¶ 25} Here, the hearing officer reviewed the districts' answers to the 17 questions and concluded that "only a few of them apply." (Hearing Officer's Report and Recommendation ["R & R"] at 20.) The hearing officer also concluded: "However, because no students are involved in the proposed area of transfer, the only issue of significance is the loss to [CPSD] of the assessed valuation of these four properties." (R & R at 20.)

{¶ 26} The hearing officer also considered the ten additional factors and concluded that eight of the ten factors did not apply in this case. As to the remaining two applicable factors, arising from Ohio Adm.Code 3301–89–03(B)(5) and (6), the hearing officer found the following:

(5) *The transfer shall not cause, preserve, or increase racial isolation.* This factor is not significant in this case.

(6) *All school district territories should be contiguous unless otherwise authorized by law.* The school district territories will remain contiguous if the proposed transfer of territory is approved.

(Emphasis sic. R & R at 21.)

{¶ 27} The hearing officer appropriately acknowledged that "[w]hen a transfer of school districts is proposed, a balancing must take place between many competing factors in order to achieve the desired result of achieving what is in the best interests of the students concerned." *Garfield Hts. City School Dist. v. State Bd. of Edn.* (1990), 62 Ohio App.3d 308, 323, 575 N.E.2d 503. The

"students concerned" are not just those students within the transferring territory; rather, all students in both the transferring and acquiring territories must be considered. Id. "Thus, evidence that a transfer may be in the best interest of the students in the transfer area must be balanced against evidence of the potential harm such a transfer may have on the other students in the affected districts." (R & R at 25.)

{¶ 28} When balancing the interests of students in the transferring area against the interests of the students in the relinquishing area, the hearing officer made two key findings. First, the hearing officer concluded that appellants had presented no evidence of the impact on students in the transferring territory. Rather, "[t]he students in the transfer territory attend private school and would therefore not benefit from the proposed transfer." (R & R at 26–27.) In essence, because no students in the transferring area attended public school, there was no evidence in favor of the transfer.

{¶ 29} Second, recognizing no evidence in favor of the transfer, the hearing officer turned to the evidence of the harm that would result and considered the only factor he found to be significant, i.e., the financial impact of the transfer upon CPSD. At the hearing, CPSD presented no testimony concerning the financial impact. However, CPSD's answers to the questions posed by ODE's questionnaire and the attached "Information upon which to base consideration of school territory transfer following annexation, Section 3311.24, O.R.C." addressed that impact. The information form included statistics on enrollment and valuation for the current year and the past four years, the estimated future growth for the next three years, and tax rates. The form also stated that the number of students in the transferring area was "[c]urrently unknown." The assessed valuation of the transferring area was identified as $373,840.

{¶ 30} The hearing officer made findings of fact concerning the financial impact of the proposed transfer, as well as the harm from previous transfers, as follows:

12. The market value of these four properties for real property tax purposes presently totals $373,840 in a[ss]essed valuation (a[ss]essed valuation being 35% of market value). State Board Ex. 24.

* * *

29. [CPSD's] responses to the 17 questions and 10 additional factors [show] that the transfer would involve the loss of $373,840 in a[ss]essed valuation. (Note that assessed valuation is approximately 35% of fair market value). The district's responses also show that losses from prior transfers have been suffered by Cincinnati Public Schools exceeding $18 million in assessed valuation. Although a large district, any transfer would be detrimental to the fiscal

or educational operation of the district. It is clear that prior transfers have caused substantial harm to the district. State Board Ex. 24.

(R & R at 15, 18–19.)

{¶ 31} The trial court declined to disturb the hearing officer's determinations as to the appropriate weight to be given the evidence of financial impact. The trial court concluded that the financial "windfall to [MCSD] would not be significant, nor likewise would the loss to CPS[D]. Nevertheless, it is still one of the considerations used in the balancing test."

{¶ 32} We agree that pursuant to Ohio Adm.Code 3301–89–02(B)(9), it is appropriate to consider whether "the loss of either pupils or valuation [will] be detrimental to the fiscal or educational operation of the relinquishing school district." This court has previously stated, "This question may be answered by evidence showing the projected loss of revenue to a school district and a finding concerning how the loss of revenue is a ' "factor significant enough to stand in the way of the proposed transfer." ' " *Crowe v. State Bd. of Edn.* (Oct. 26, 1999), Franklin App. No. 99AP–78, 1999 WL 969708, quoting *Levey v. State Bd. of Edn.* (Feb. 28, 1995), Franklin App. No. 94APE08–1125, 1995 WL 89703.

{¶ 33} In *Crowe*, the hearing officer concluded that the loss of property tax dollars from the proposed transfer would be "detrimental to the fiscal or educational operation" of the transferring district. On review, the trial court found, and this court affirmed, however, that no evidence showed how much money the transferring district would lose. This court stated:

We do not believe that the purpose of Ohio Adm.Code 3301–89–02(B)(9) is to simply determine whether a relinquishing school district will lose funds. Since Ohio school districts receive their funding primarily from state revenue paid on a per pupil basis, and local revenue "which consists primarily of locally voted school district property tax levies" (see *DeRolph v. State* (1997), 78 Ohio St.3d 193, 199, 677 N.E.2d 733), almost every transfer of property from a school district will negatively impact their funding. The key to Ohio Adm.Code 3301–89–02(B)(9) is whether the loss of funds would be "detrimental to the fiscal or educational operation of the relinquishing school district." This requires a finding of how the loss of income would affect the relinquishing school district. Simply presenting evidence that the relinquishing school district will lose funds is insufficient to show that the loss of funds would be detrimental to the fiscal or educational operation of the school district.

{¶ 34} Here, the hearing officer's findings, and the trial court's affirmation of those findings, are contrary to *Crowe*. While the hearing officer concluded that "any transfer would be detrimental to the fiscal or educational operation of the district," there was no evidence, and the hearing officer made no finding, as to how the loss of income would affect CPSD. Instead, the hearing officer relied on

CPSD's answers concerning the assessed valuation of the transferring property and its unsupported "Yes" to the question whether the loss of "either pupils or valuation" would "be detrimental to the fiscal or educational operation of the relinquishing school district." Under *Crowe,* this simple assertion that CPSD will lose valuation is insufficient to show what the loss of funds would be or that the loss would be detrimental to the fiscal or educational operation of the district. Therefore, as to any financial impact upon CPSD, the trial court erred in finding that the board's order was supported by reliable, probative, and substantial evidence. Cf. *Hicks v. State Bd. of Edn.,* Franklin App. No. 02AP–1183, 2003-Ohio-4134, 2003 WL 21791276, at ¶ 18 (finding evidence to support financial-impact determination and stating, "Unlike the petitioners in *Crowe,* East Cleveland presented testimony from the district treasurer, the library director, and real estate appraiser evidencing the detrimental effects of the transfer").

{¶ 35} The hearing officer's factual finding that "[i]t is clear that prior transfers have caused substantial harm to the district" is equally unsupported. Question IV of the information form attached to the questionnaire asked for information concerning "previous losses through annexations and transfers, if any." CPSD identified the following:

1. Tax year 2001 (Forest Hills L.S.D.) 125 Students $16,131,490 (assessed)

2. Tax year 1997 ( [Madeira] C.S.D.) 163 students $1,941,630 (assessed)

{¶ 36} At the hearing, CPSD presented no evidence to support these statistics. In their posthearing brief, as before this court, appellants assert that these numbers are simply wrong and that a review of the legal opinions concerning these prior transfers shows that they are wrong. See *Cincinnati City School Dist. v. State Bd. of Edn.* (1996), 113 Ohio App.3d 305, 680 N.E.2d 1061 (affirming trial court's judgment granting property transfer from CPSD to MCSD and referring to referee's finding that 14 school-age children lived in 48 homes at issue); *Schreiner v. Ohio Dept. of Edn.* (Nov. 9, 1999), Franklin App. No. 98AP–1251 (reversing trial court's judgment affirming board's denial of proposed transfer from CPSD to Forest Hills Local School District, stating that the proposed area consisted of 125 homes and referring to referee's findings that the loss of 20 public-school students would have de minimis effect on the educational operation, minority student ratio, and fiscal resources of CPSD).

{¶ 37} CPSD appears to have conceded the inaccuracy of these numbers. In its response to appellants' objections to the hearing officer's report and recommendation, CPSD stated:

[Appellants] argue that a clerical error was made in the listing of the number of students transferred in prior cases. That mistake has nothing to [d]o with

the merits of the pending transfer request and that figure was not cited by the Hearing Officer and not relied on by him.

{¶ 38} While we agree with CPSD that the hearing officer did not cite the figures provided by CPSD, the hearing officer did make a finding that "prior transfers have caused substantial harm to the district." (R & R at 19.) Regardless of whether the figures concerning the size of previous transfers were accurate, there was no evidence before the hearing officer to support a finding that the transfers "caused substantial harm." Thus, the trial court erred in concluding that the board's decision, in this respect, was supported by reliable, probative, and substantial evidence.

{¶ 39} This lack of evidence concerning financial impact upon CPSD was deliberate. At the outset of the hearing, CPSD's counsel stated that CPSD would not be presenting any evidence or testimony because, as a matter of law, appellants "cannot meet their burden of showing the present and ultimate good of the students since none are at risk currently. It's a complete and total non-event for purposes of the ultimate good of any student involved here." We turn to that issue now.

{¶ 40} As the trial court found, the evidence before the hearing officer showed that only one school-age student lived within the transfer area at the time of the March 23, 2005 hearing. That student's mother, Donna Salmon, testified that she and her husband had three children who, by the time the hearing occurred in 2005, were 21, 19, and 15 years old. None of the children had attended public school; all had attended private elementary and high schools. At the time of the hearing, the Salmons' 15-year-old son, Mark, attended St. Xavier High School, a private school.

{¶ 41} On cross-examination, Mrs. Salmon was asked:

Q. To the best of your knowledge, if this transfer would have been granted back to 2000 at the time that it was submitted, would it have made any difference as to the ability of your children to attend St. Gertrude's [private elementary school] or St. Xavier High School?

Mrs. Salmon responded: "No, it wouldn't have." Id.

{¶ 42} Mrs. Salmon was not asked, nor did she testify, whether she and her husband wanted the option in 2000, when the petition was filed, to enroll any of their three school-age children in public school or whether their decisions might have been different if the transfer had occurred closer to the time of the petition.

{¶ 43} Robert Salmon, Donna's husband and Mark's father, also testified. Mr. Salmon confirmed Mark's attendance at St. Xavier, as well as his own graduation from St. Xavier. He stated:

I have a strong bond to St. Xavier High School. There's a tremendous sense of community there. Both of my sons attended; one graduated last year. My other son is in attendance right now. There's a strong sense of commitment and community there. But without an option to maintain those relationships with the Madeira parents at all, that option cannot [be] exercised. It can't be because it doesn't exist.

If this petition is granted, that option exists. Maybe not for myself or my wife, but maybe for the next people that own the house. We've moved once in the last 21 years, and we plan on staying there a long time. But for the next people that come in, that option will exist, and it doesn't right now. I'd like to see that exist for them.

{¶ 44} In his testimony, Richard Bartchy confirmed that only one school-age student currently lived within the transfer area, and that this one student attended private school. Bernard Schlake also testified that no school-age children had lived in his home in the transfer area.

{¶ 45} Thus, the testimony of all witnesses confirmed that Mark was the only school-age student living within the transfer area and that he attended private school. Given the testimony, it was reasonable for the hearing officer to conclude, as he did, that "there are no students in the proposed transfer area who attend [CPSD]; all students residing in the proposed transfer area attend private schools and it is likely that they will continue to attend private school even if the transfer is granted." (R & R at 26.) We find, however, that this factual finding did not reasonably lead to the legal conclusion that appellants had presented no evidence in favor of the transfer.

{¶ 46} First, we reject the notion that evidence showing that the one school-age student who could be affected by a transfer currently attends private school and is likely to continue to attend private school precludes further consideration of other evidence favoring the transfer. Other proposed transfers have similarly affected few, if any, school-age students currently living within a transfer area and attending public school.

{¶ 47} For example, the "Ken Arbre" transfer from CPSD to MCSD involved a subdivision consisting of 48 homes located within the city of Madeira. In that case, the referee found that none of the subdivision's 14 school-age children attended any of CPSD's schools, "except one child who attended an alternative Cincinnati school and was scheduled to graduate in 1994 [two years after the petition was filed and less than a year after the referee's report and recommendation]. Three school-age children from the subdivision were home-schooled." *Cincinnati*, 113 Ohio App.3d at 308, 680 N.E.2d 1061.

{¶ 48} Also, in *Levey*, Franklin App. No. 94APE08–1125, 1995 WL 89703, the transfer area consisted of a ten-acre parcel of land. A Toledo schools executive testified that there were 11 school-age children who lived in the transfer area. However, one of the children had moved out of the territory, and "[a]ll ten of the school-age children who currently reside in the territory attend private schools." See, also, *In re Proposed Transfer of Territory from Clermont Northeastern Local School Dist. to W. Clermont Local School Dist.*, Franklin App. No. 02AP–257, 2002-Ohio-5522, 2002 WL 31303302 (involving one school-age child); *Samson v. State Bd. of Edn.* (Aug. 13, 1998), Franklin App. No. 97APE12–1702, 1998 WL 481075 (involving three school-age children, all of whom moved out of the transfer area after the hearing and before the board's decision).

{¶ 49} In fact, in *Levey*, this court rejected the hearing officer's finding that "since no current school-age child would be affected by the decision because they all attend private schools, it was merely the personal preference of the petitioners to transfer." Instead, the trial court found, and this court affirmed, that other evidence existed to support the transfer, including evidence that the transfer area was an island, the distance to the acquiring district schools would be less, and transportation safety would be improved. The court concluded:

> Rather, evidence demonstrates that the desired result of achieving what is "the present and ultimate good of the pupils concerned" is obtained if the proposed transfer is permitted based on opportunities for participation and involvement in the neighborhood schools with neighboring children, greater safety in transportation and a decrease in distances to be traveled.

{¶ 50} Based on this court's prior decisions, we similarly reject, and find that the trial court abused its discretion by not rejecting, the hearing officer's legal conclusion that since only one school-age student lived within the transfer area and that student attended private school, appellants had presented no evidence in favor of the proposed transfer. Instead, the hearing officer should have examined all the evidence presented and then weighed the competing factors to determine whether a transfer was appropriate.

{¶ 51} Having determined that the hearing officer made legal errors, we must consider whether any evidence remains to support the board's order. In considering the evidence disfavoring the transfer, the hearing officer stated:

> For [CPSD], the only evidence to rely on is their responses to the 17 questions outlined above. In particular, [CPSD] is concerned that there are racial isolation implications and believes that loss of either pupil or valuation is detrimental to the fiscal or educational operation of its district. Furthermore, previous transfers have caused substantive harm to [CPSD]. Because the one student in the proposed transfer area attends private school, the issue is not whether [MCSD] can provide a better education than [CPSD]. The primary

issue is whether the benefit to the students in the transfer area outweighs the harm to the other students in the affected district. [Appellants] did not introduce any evidence regarding how this proposed transfer would benefit the students in the transfer territory and [MCSD] did not take part in the request. After a careful balancing of the factors involved, it is apparent that a greater harm is caused if the proposed transfer of territory is approved.

(R & R at 27.)

{¶ 52} We have already concluded, however, that there is no evidence to support the hearing officer's finding that the transfer would have a detrimental impact on the fiscal or educational operation of CPSD. And, in any event, the trial court concluded that any financial impact on CPSD, or the resulting "windfall" to MCSD, was "minuscule," "de minimis," or not significant. We also concluded that there is no evidence to support the hearing officer's finding that prior transfers have caused substantial harm to CPSD. And, as to any racial implications, the hearing officer concluded, and the trial court agreed, that the racial-isolation factor was "not significant in this case." (R & R at 21.) Thus, we can conclude only that no reliable, probative, and substantial evidence supports the board's order denying the transfer, and we find that the trial court abused its discretion in affirming the board's decision.

{¶ 53} Having concluded that there is no evidence to support the board's denial of the transfer, we turn to the question whether appellants met their burden of proving entitlement to the transfer. To that end, we need look only to the hearing officer's own findings of fact to find evidence supporting the transfer. Specifically, four homeowners testified concerning their isolation from CPSD, their separation from the city of Madeira for certain purposes, including voting, their geographic connection to the city of Madeira, and the positive impact a transfer would have on their community spirit and pride. We note, too, as the trial court noted, that appellants also presented evidence of geography as to roads to the nearest schools and their proximity to the transfer area. This evidence is representative of evidence supporting transfer in many other cases. See, e.g., *Rossford Exempted Village School Dist. Bd. of Edn.*, 63 Ohio St.3d at 708, 590 N.E.2d 1240 (in affirming board's order transferring property to Perrysburg school district, citing evidence showing "that Perrysburg is the focus of the [petitioning] family's social, business and community life"); *In re Proposed Transfer of Territory from Clermont Northeastern Local School Dist.*, Franklin App. No. 02AP–257, 2002-Ohio-5522, 2002 WL 31303302 (affirming trial court's reliance, in part, on evidence of transportation safety and school proximity); *Levey*, Franklin App. No. 94APE08–1125, 1995 WL 89703 (relying, in part, on evidence regarding school proximity, transportation safety, and "opportunities for participation and involvement in the neighborhood schools with neighboring

children"). Cf. *Trout v. Ohio Dept. of Edn.*, Franklin App. No. 02AP–783, 2003-Ohio-987, 2003 WL 758121 (affirming board's denial of transfer based, in part, on evidence of no positive impact on transportation time or safety and on lack of evidence "to show how a transfer would promote a sense of community among the residents of the proposed transfer area"). Thus, in the face of no evidence supporting a denial of the transfer, we conclude that appellants presented evidence to support the transfer and met their burden of proving entitlement to the transfer.

{¶ 54} For these reasons, we sustain appellants' assignment of error, and we reverse the decision of the Franklin County Court of Common Pleas affirming the board's order denying the transfer. The trial court is directed to enter a judgment that (1) directs the board to approve appellants' request to transfer the proposed property to MCSD and (2) is consistent with the reasoning of this opinion.

Judgment reversed.

KLATT and McGRATH, JJ., concur.